Case 3:19-cv-00161   Document 28   Filed on 07/27/20 in TXSD   Page 1 of 13

United States District Court
Southern District of Texas
**ENTERED**
July 27, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TROY OWEN, | § § § § | |
| Plaintiff. | | |
| VS. | § § § § § § § § | CIVIL ACTION NO. 3:19–CV–00161 |
| FEDERAL CROP INSURANCE CORPORATION, ET AL., | | |
| Defendants. | | |

## MEMORANDUM AND RECOMMENDATION

This is an action for judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, of a final agency action relating to the federal crop insurance program. Plaintiff Troy Owen ("Owen") seeks review of the good farming practices determination pertaining to his 2017 organic cotton crop. Defendants are the Federal Crop Insurance Corporation, the United States Department of Agriculture's Risk Management Agency ("RMA"), and Sonny Perdue, in his capacity as Secretary of the United States Department of Agriculture. Before me are the parties' cross-motions for summary judgment. *See* Dkts. 21 and 23. Because the record amply demonstrates that the agency decision was arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law, I recommend that Owen's motion for summary judgment (Dkt. 21) be **GRANTED** and Defendants' motion for summary judgment (Dkt. 23) be **DENIED**.

## FACTUAL BACKGROUND

Owen is a farmer in Matagorda County, Texas. For the 2017 crop year, Owen purchased from Wiese Crop Insurance Services, LLC ("Wiese") a federally reinsured policy of crop insurance for his planned organic cotton crop. The policy insured the organic cotton crop against "unavoidable, naturally occurring events." Dkt. 23-1 at 21. From the middle of April through the beginning of May of 2017, Owen planted his insured cotton crop. It is undisputed that the Matagorda County area experienced an unusually high amount of rainfall in June 2017. Owen contends that this wet weather destroyed his organic cotton acreage. On June 20, 2017, Owen submitted a Notice of Loss to his crop insurance provider stating the cause of loss as "Excess Moisture/Precip/Rain." Dkt. 17-6 at 39.

In March 2018, Crop Risk Services, acting as the adjuster for Wiese, denied Owen's crop insurance claim for his organic cotton crop. Owen requested reconsideration of that decision, but Crop Risk Services again denied Owen's claim, holding that Owen's failure to follow good farming practices nullified his ability to collect on the crop insurance policy. In light of these decisions and in accordance with federal law, Owen formally requested a good farming practices determination from the RMA.

The RMA reached out to Owen and offered him the opportunity to submit any additional documentation he wanted the agency to consider. On December 17, 2018, the RMA issued its good farming practices determination, concluding that Owen's fertilization, weed control, and defoliation/harvest practices were not good farming practices, thus resulting in uninsurable losses to his organic cotton crop. *See* Dkt. 17-23 at


8 (Owen "failed to follow generally recognized good farming practices for [his] cotton crop, which is not an insurable cause of loss.").

Following the RMA's written determination, Owen filed this lawsuit seeking judicial review of the agency's determination.

## OVERVIEW

**A.     THE FEDERAL CROP INSURANCE PROGRAM**

For the American farmer, the 1930s were an extremely tough period.  Private insurance companies were unwilling to offer crop insurance, viewing such policies as "too great a commercial hazard."  *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 n.1 (1947).  And then the Dust Bowl, one of the nation's great ecological disasters, swept the Great Plains, destroying the farming industry and causing widespread financial hardship, hunger, and poverty.  In response, Congress passed—and President Franklin D. Roosevelt signed— the Federal Crop Insurance Act ("FCIA") in 1938, authorizing the federal crop insurance program.  The FCIA was enacted "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance."  7 U.S.C. § 1502(a).  Over the years, thousands of American farmers have utilized the program to procure crop insurance and protect themselves from catastrophic losses.

To "carry out the purposes" of the FCIA, Congress created the Federal Crop Insurance Corporation ("FCIC"), acting under the auspices of the United States Department of Agriculture.  7 U.S.C. § 1503.  Congress also created the RMA, a wholly

government-owned corporate body and agency within the Department of Agriculture charged with supervising the FCIC and implementing a nationwide crop insurance program. *See* 7 U.S.C. § 6933.

Crop insurance authorized by the FCIA is offered either directly through the FCIC or through private insurance companies that sell and service policies that are reinsured by the FCIC. *See* 7 U.S.C. § 1508(a)(1). Even though private companies sell most federal crop insurance policies, the RMA maintains significant control over the availability of crop insurance. The RMA establishes standard policy guidelines, including terms and conditions, which must be included in any crop insurance policy issued by a private insurance company. "Essentially, RMA licenses [private insurance companies] to sell crop insurance policies that comport with federal guidelines, and RMA reinsures those contracts with the full faith and credit of the United States Government." *Nobles v. Rural Cmty. Ins. Servs.*, 122 F. Supp. 2d 1290, 1292 (M.D. Ala. 2000).

**B.    ORGANIC FARMING**

Because this case concerns organic farming, I need to briefly discuss the national standards in place for organically grown agricultural products. "Organic food is produced by farmers who emphasize the use of renewable resources and the conservation of soil and water to enhance environmental quality for future generations." *See* Mary V. Gold, *Organic Production/Organic Food: Information Access Tools*, https://www.nal.usda.gov/afsic/organic-productionorganic-food-information-access-tools (last visited July 27, 2020). In 2000, the USDA implemented regulations, known as the National Organic Program, defining which agricultural products qualify as organic. *See*

4

*National Organic Program*, 65 Fed. Reg. 80548 (Dec. 21, 2000) (codified at 7 C.F.R. pt. 205). "The [National Organic Plan] provisions governing the production, marketing, and labeling of 'organic' products are complex, detailed, and specific." *All One God Faith, Inc. v. Hain Celestial Grp., Inc.*, No. C 09–03517, 2011 WL 4433817, at *2 (N.D. Cal. Sept. 22, 2011).

Before a product can be labeled "organic," a government-approved certifier inspects the farm where the crop is grown to ensure the farmer is following all the rules necessary to meet the USDA's organic standards. *See* 7 C.F.R. § 205.400(c) (2015). Those seeking to obtain organic certification must also implement an organic plan and update it annually. *See* 7 U.S.C. § 6513(a); 7 C.F.R. § 205.400(b) (2015).

> The term "organic plan" means a plan of management of an organic farming or handling operation that has been agreed to by the producer or handler and the certifying agent and that includes written plans concerning all aspects of agricultural production or handling described in this chapter including crop rotation and other practices as required under this chapter.

7 U.S.C. § 6502(14). An organic plan is, among other things, required to "contain provisions designed to foster soil fertility, primarily through the management of the organic content of the soil through proper tillage, crop rotation, and manuring." 7 U.S.C. § 6513(b)(1). The organic plan must "be reviewed by the certifying agent who shall determine if such plan meets the requirements of the programs." 7 U.S.C. § 6513(a). "Although certifying agents essentially play the role of federal regulators in that they monitor compliance with the federal organic regulations, certifying agents are paid by the producers and processors that use their certification services, not by the [Department of Agriculture] or any other governmental entity." Michelle T. Friedland, *You Call That*

5

*Organic?--The USDA's Misleading Food Regulations*, 13 N.Y.U. Envtl. L.J. 379, 390 (2005) (footnote omitted).

### C.   GOOD FARMING PRACTICES

Under the relevant insurance policy and applicable federal regulations, losses resulting from a failure to follow good farming practices are uninsurable.  *See* Dkt. 23-1 at 21.  Good farming practices are specifically defined as:

> [P]roduction methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance . . . which are . . . **for organic farming practices, those generally recognized by organic agricultural experts for the area <u>or</u> contained in the organic plan**.

*Id.* at 4; 7 C.F.R. § 457.8 ¶ 1 (2017) (emphasis added).  This language clearly means that good farming practices for organic farming include those production methods, as generally recognized by organic agricultural experts for the area, utilized to produce the insured organic crop and allow it to make normal progress toward maturity.  *See id.*  Good farming practices also include those production methods contained in the farmer's organic plan.  *See id.*  Importantly, the federal regulations specifically provide that a good farming determination must be based upon farming practices "generally recognized by organic agricultural experts for the area" <u>or</u> "contained in the organic plan." *Id.*

Under the applicable federal regulations, the insurance provider will initially make a determination as to what constitutes good farming practices.  *See* 7 C.F.R. § 457.8 ¶ 20(d)(1) (2017).  A farmer dissatisfied with the insurance provider's good farming practices decision may request a determination from the FCIC as to whether the farmer's practices meet the good farming standard.  *See* 7 C.F.R. § 457.8 ¶ 20(d)(1)(i) (2017).  If

6

the FCIC issues a good farming practices determination with which the farmer does not agree, a farmer is entitled to file suit in the United States District Court where the insured acreage is located. *See* 7 C.F.R. § 457.8 ¶ 20(d)(2)(ii)(B) (2017).

## STANDARD OF REVIEW

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In the context of a challenge to an agency action under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019*)* (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008)). In evaluating a challenge under the APA on summary judgment, my role is that of an appellate tribunal, applying "a narrow and highly deferential standard" of review to agency action. *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). A reviewing court should only set aside an agency decision in limited circumstances, such as when that agency decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." (quoting 5 U.S.C. § 706(2)).

7

## ANALYSIS

In this lawsuit, Owen claims that the RMA arbitrarily and capriciously determined that he did not use good farming practices in the production of his 2017 organic cotton crop. Owen divides his argument into two parts. First, Owen argues that the RMA's determination that he failed to use "generally recognized" organic farming practices is not supported by the opinion of any organic agricultural expert for the area where the organic crop acreage is located. Second, Owen contends that the RMA's failure to consider that he followed his organic plan completely disregards the law governing good farming practices determinations.

Let me focus on Owen's second argument—his contention that the RMA should have, but failed to, take into account his organic plan in making its good farming practices determination.[1] As an initial observation, there is no dispute that the federal regulations plainly and unmistakably provide that good farming practices, by definition, include those practices "contained in the organic plan." 7 C.F.R. § 457.8 ¶ 1 (2017). The federal regulatory framework also provides that a farmer has employed good farming practices based on the generally recognized views of "organic agricultural experts for the area." *Id.* But, importantly, the applicable regulations <u>do not</u> require a farmer to show both that (i) organic experts approve the production methods; and (ii) compliance with an organic plan. Instead, the text clearly states that good farming practices are defined as "those generally recognized by organic agricultural experts for the area **or** contained in the organic plan."

---

[1] Because I find Owen's second argument concerning the organic plan compelling, I need not address the organic agricultural expert issue.

*Id.* (emphasis added). Unsurprisingly, the use of the word "or" is "almost always disjunctive," and there is nothing here that suggests a different meaning or interpretation. *United States v. Woods*, 571 U.S. 31, 45 (2013). Thus, the federal regulations establish alternative means by which good farming practices can be demonstrated.

What is notably absent from the RMA's December 17, 2018 written determination is any discussion of Owen's organic plan. The agency's written decision is eight single-spaced pages, but you will not find the term "organic plan" mentioned even once, no matter how hard you look. Instead of addressing the organic plan, as it should have, the RMA focused exclusively on five issues relating to how agricultural experts viewed Owen's organic production methods:

> The issues that must be resolved in this case [are]:
>
> 1. Whether you applied adequate fertilizer on your cotton which would allow your crop to make a normal progress toward maturity and produce at least the yield used to determine the production guarantee.
>
> 2. Whether you used adequate weed control methods on your cotton crop in a timely manner to control weeds which would allow your crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee.
>
> 3. Whether you used adequate insecticide on your cotton crop which would allow your crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee.
>
> 4. Whether your fields were planted in a manner that supported adequate drainage control with an established seedbed which would allow your crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee.
>
> 5. Whether you had an intent to defoliate/harvest your cotton crop which would allow your crop to make normal progress toward maturity to harvest at least the yield used to determine the production guarantee.

9

Dkt. 17-23 at 1–2.

The failure of the RMA to consider Owen's organic plan in determining whether he followed good farming practices is not a minor, excusable mistake. "Agency regulations are an extension of the legislative process and bind the agency with the force and effect of law. As with statutes, an agency must comply with its own regulations, and the court must review an agency's actions to ensure conformity with relevant regulations." *Am. Stewards of Liberty*, 370 F. Supp. 3d at 725–26. As the governmental entity charged with ensuring that farmers like Owen receive a good farming practices determination in accordance with federal regulations, the RMA retains significant responsibility. The "failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007) (quotation marks and citation omitted). *See also Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) ("Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.") (quotation marks and citation omitted). In short, the RMA should have considered the existence of an organic plan as part of its good farming practices determination. In neglecting to do so, the RMA acted arbitrarily and capriciously, not in accordance with the law. Its decision should be set aside. *See Am. Stewards of Liberty*, 370 F. Supp. 3d at 725 ("Agency action that disregards applicable law is arbitrary and capricious, and must be set aside.").

Had the RMA properly applied the appropriate standard for assessing whether Owen employed good farming practices, there is no question that the agency would have determined that Owen did, in fact, utilize good farming practices. A review of the administrative record makes this clear. Elizabeth Nelson is an organic inspector with more than 11 years of experience, having performed more than 2,700 crop inspections. For the past eight years, Nelson has spent approximately half the year in Texas conducting crop inspections. In a letter made part of the administrative record, Nelson noted that Owen "submitted an Initial Organic System Plan to [Nature's International Certification Services] on 04/01/2013 with annual updates on 5/19/2014, 06/03/2015, 03/21/2016, and 04/22/2017. Mr. Owen has been inspected annually as per the National Organic Program requirements." Dkt. 17-23 at 206. Nelson also explained that Nature's International Certification Services assigned her to audit Owen for organic production in 2017, and she did so. With this hands-on knowledge, Nelson further confirmed:

> Mr. Owen followed his organic system plan, met all the organic requirements for crop production, he completed all possible human tasks to ensure that they get a cotton crop. Mr. Owen maintained his fields and met all 'good agricultural practices' that are possible in organic production. Loss of this crop was due to weather conditions beyond producer's control, aka 'Act of God'.

*Id.* at 207. This unrefuted evidence in the administrative record establishes beyond a shadow of a doubt that Owen properly submitted an organic plan and followed that organic plan. Because Owen adhered to those practices outlined in his organic plan, the RMA could not have, as a matter of law, concluded that Owen failed to follow good farming practices.

Noting that the administrative record does not contain the complete organic plan, Defendants contend that the RMA cannot be faulted for failing to consider a document that is nowhere to be found in the administrative record. This argument dies on the vine. While it might have been preferable to review the organic plan in its entirety, its absence from the administrative record is of no moment. As already pointed out, there is compelling—and unrebutted—evidence that conclusively establishes that Owen submitted an organic plan and followed the farming practices outlined in his organic plan as required by relevant regulations. The federal regulations dictate the rules that govern a determination of good farming practices. It is important to keep in mind that the ultimate question before me is whether the RMA followed its own regulations in making this determination. It would make a mockery of the process if the RMA could simply ignore its own regulations on a case-by-case basis and arbitrarily determine, with no guiding principles, whether a farmer complied with good farming practices.

To summarize, I conclude that the RMA acted arbitrarily and capriciously, not in accordance with the law, by failing to consider Owen's organic plan in making its good farming practices determination. Accordingly, the RMA's determination that Owen did not use good farming practices and is not entitled to a crop insurance indemnity should be set aside. *See* 7 C.F.R. § 400.98(f) ("Any reconsideration decision by the Agency regarding good farming practices shall not be reversed or modified as a result of judicial review unless the reconsideration decision is found to be arbitrary or capricious."); *Mt. Valley Farms & Lumber Prod., L.L.C. v. Fed. Crop Ins.*, No. 1:10-CV-2327, 2012 WL 400729, at *1 (M.D. Pa. Feb. 7, 2012) (reversing an administrative decision of the RMA and

12

entering "judgment in favor of Plaintiffs, finding that they followed good farming practices . . . , thus permitting their crop insurance claims be paid").

## CONCLUSION

For the reasons detailed above, I recommend that Owen's motion for summary judgment (Dkt. 21) be **GRANTED** and Defendants' motion for summary judgment (Dkt. 23) be **DENIED**.

Accordingly, the administrative decision of the RMA should be **REVERSED** and judgment should be **ENTERED** in favor of Owen, thus permitting payment of his crop insurance claim.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED in Galveston, Texas, this 27th day of July, 2020.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE